28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK MANN,
Plaintiff,

v.

MR. SCHLOTTMAN (SOE) FCI MILAN;
MS. BITTENBENDER (SOE) FCI ALLENWOOD;
WARDEN J.A. TERRIS; MR. GILLESPIE; C.O. RISCHE;
BUREAU OF PRISONS; DEPARTMENT OF JUSTICE.
Defendants.

Case:2:15-cv-12869
Judge: Leitman, Matthew F.
MJ: Whalen, R. Steven
Filed: 08-07-2015 At 11:36 AM
PRIS MANN V. SCHLOTTMAN ET AL. (SO)

CIVIL COMPLAINT AT LAW

NOW COMES Plaintiff, Jack Mann, (hereinafter 'Mann'), pro-se, in forma pauperis, with the above named action, and in support thereof states as follows:

1. On or about August of 2014, continuing and up to this date, SOE Schlottman saw Mann in the SHU (Special Housing Unit) at FCI Milan, in Milan, Michigan. During the visit SOE Schlottman told Mann that he would see if he could locate Mann's requested document on the Resource Center computer.

2. Resource Center computers are run by Education and VT Officer Rische. Mann submitted inmate requests to staff to provide Mann copies of his manuscript/short story that he wrote for a pending creative writing class to be provided by Mr. Gillespie.

3. When SOE Schlottman brought the fact that this manuscript is allegedly non-educational, Mann told SOE Schlottman that the writing was his (Mann's) and that he had been working on it for an upcoming creative writing class for Gillespie's class.

4. The document (35 to 100 pages long) was saved in MS Word within the Resource Room's computers which are all on a server owned and operated by the Bureau of Prisons (BOP).

5. The document was saved in a password protected environment whereby Mann had to use a User ID and password to access this document, which is Mann's property, protected under the Fifth Amendment. Mann is protected from being "deprived of life, liberty, or property without due process of law." U.S. Const., Amend. V. Mann, is also protected by the First Amendment Right to exercise freedom of speech.

6. Mann wrote a short fiction story that may or may not have 12 or more stories contained within. It is clear that this writing for a Creative Writing Class to be held by Mr. Gillespie (education employee of the BOP who holds classes of this nature from time to time), and it is also very clear that this writing is the property of Jack Mann. Further it is clear that this is a First Amendment Right to freedom of speech by Mann. This is not a pre-sentence report or other court document that Mann would not be allowed to have. See Wheeler v. Gilmore, 998 F. Supp. 666, 670 (E.D. Va. 1998); see also Taliaferro v. DiFrancesco, 871 F. Supp. 330, 330-31 (E.D. Wis. 1994)(concluding that no federal constitutional right to privacy was violated when a clinical services supervisor read portions of a state prisoner's pre-sentence report during a group treatment session); but see Soucie v. County of Monroe, 736 F. Supp. 33, 35-37 (W.D. N.Y. 1990)(concluding that the constitutional right to privacy protected an inmate from disclosure of youthful offender information contained in his pre-sentence report). Mann is not dealing with any information from Court documents, he is only dealing with his own, private, intellectual property known as (commonly known as) Fiction Writing or Creative Writing.

7. SOE Schlottman came to SHU multiple times and told Mann that

he would see if he could find Mann's property in the computer and print it off.

8. SOE Schlottman also told Mann in SHU that the writing was "not educational, Mann." Mann stated that this was writing for a upcoming class by Gillespie, and SOE Schlottman told Mann, again, that he would look into it.

9. Mann was shipped out after the last meeting with SOE Schlottman when Schlottman told Mann that he would, in fact, get him the property AFTER after Manne explained that C.O. Rische had allowed MULTIPLE inmates to have their own material when leaving the institution whether it was for them to go home, or whether it was for them to take to another institution. In fact, Steven Byers took much of the data that he worked on in Computer VT (for Mr. Rische) to the Camp in South Dakota, another BOP facility. This is allowing an inmate from a federal prison (the exact same one as Mann) to go to another institution with all of the drawings and other items that Byers worked on in Computer VT (whether it was on MS Office or AutoCAD). This preferential treatment of one group of inmates over another is exceedingly apparrant in this instance.

10. When the BOP employee witholds a First Amendment Right protected document to either punish a inmate further than what was given to him by a Federal Judge OR for their own use (Plaigarism) it is a clear violation of Mann's rights (First & Fifth Amendments).

11. Mann wrote Schlottman after he was transferred to FCI Allen-wood. Schlottman did not respond, however, SOE Schlottman did, in fact, send an e mail to Molly Bittenbender (SOE Allenwood) about Mann's property. Bittenbender then sent Mann a yellow post it note on

a copy of Schlottman's e mailed scan of Mann's letter from SHU in FCI Allenwood to SOE Schlottman (and envelope) held in a saved document file of Molly Bittenbenders (Mann believes it was listed as a .pdf file).

12. Mann, on or about //7/2015, had his bag stolen from in front of the dining hall at FCI Allenwood. He asked the LT on duty (short hispanic woman) if she could look at the tapes (Video) of the morning to review who left the dining hall between 10:45am and 11:00am with his specific bag (matching his description of the shape and size) and Mann was told that the resolution on the cameras is terrible and it cannot even make out prisoners faces. Mann told the LT that he "found that hard to believe..." and there was no way that the BOP did not have some form of facial recognition software. That LT walked away from Mann, and muttered something about not speaking to someone who called her a liar. Mann never said the word liar, lies, lie, or anything similar, he just stated that he believed there was some kind of software that would be able to recognize a prisoner. Needless to say, Mann's copy of the Tort Claim Form for <u>TRT-NCR-2015-03136</u> was in his stolen bag, which was purchased at commissary. The LT refused to do anything for Mann.

13. Mann approached the SIS LT (Lyons) to tell him that he required some assistance with his stolen bag, as there was first generation copies of legal documents (including the actual yellow post it note by Bittenbender which begins, "Mr. Schlottman,...") and Mann's Tort Claim. Of course, in the fine tradition of doing absolutely nothing for inmates, BOP employees were true to form. Mann received nothing, and has sent a letter to the Northeast Regional Office asking for

a copy of the stolen Tort Claim, including the EXHIBIT 1 (Molly Bittenbender .pdf file including photo copy of post it note).

14. Mann has also submitted a request to the North Central Regional Office for a copy of the entire Tort Claim. This way Mann has covered both of his bases in this issue/arena.

15. Mann is showing obvious constitutional issues of "Freedom of Speech" through the obvious attempts to suppress Mann's document.

16. Suppression of this document is a violation of Mann's First Amendment Right to Freedom of Speech, AND a violation of Mann's right to life, liberty, or property without due process of law. U.S. Const., Amend. V.

17. In King v. Zamiara, 2015 BL 171102, 6th Cir., No. 13-1766, 6/1/15 the U.S. Court of Appeals decided that the Prison Litigation Reform Act's injury requirement doesn't apply to claims for compensatory damages that allege violations of the First Amendment. The PLRA in 42 U.S.C. § 1997e(e) provides that "[n]o Federal civil action may be brougth by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."Id.

"The applicability of this provision to claims alleging First Amendment deprivations has been a matter of significant debate," the court observed. A majority of the other courts that have addressed the issue have held that the provision does apply to claims alleging constitutional violations as the injury. The position is based on the courts' understanding of common law torts principles." Criminal Law Review, Vol 97, No. 11, 6/10/15.

Court Relies on Plain Meaning of Text. Adopting a minority

approach, the Sixth Circuit said it was "persuaded that deprivations of First Amendment rights are themselves injuries, apart from any mental, emotional or physical injury that might also arise from the deprivation, and that § 1997e(e) does not bar all relief for injuries to First Amendment Rights." Id. "Were we to construe § 1997e(e) as a majority of circuits have done, thereby grafting a physical injury requirement onto claims that allege First Amendment violations as the injury, the pharase 'for mental or emotional injury' would be superfluous." Judge Karen Nelson Moore. Id.

18. This case is brought in the E.D. of Michigan, and controlling law is now found in King v. Zamiara, 2015 BL 171102, 6th Cir., No. 13-1766, 6/1/15. Mann should have all of his injuries awarded to him as a way to send a clear and convincing message to employees of the BOP that they are not to add punishment or continue punishment that was added by a BOP employee without causing even further damages, as done here.

19. SOE Schlottman caused the injury, SOE Bittenbender furthered the injury through Acquiescence and Condoning of the injury by Schlottman. In essence, Schlottman brought Bittenbender into the claim without even understanding what he was doing. Certainly, Bittenbender also did not understand that she was approving of, condoning and acquiescing to these wrongful acts which were First Amendment Injuries, and Fifth Amendment Injuries. Just like a criminal defendant who commits a crime, then states "I didn't know that was illegal..." these two BOP employees cannot use ignorance as a defense.

20. The "decision was the product of a conscious, affirmative

choice to ratify, approve, condone and acquiesce to the conduct in question," and that all the named Defendants must be held liable under Marchese v. Lucas, 758 F.2d 181 (6th Cir. 1985). Further, the BOP, and the DOJ/USA must also be held liable under Marchese.

21. Mann, as a prisoner was harrassed, menaced, and the injuries of him being shipped out of FCI Milan due to First Amendment protected activity (See Mann v. Straub, 2:14-cv-13439) when he (Mann) submitted a letter to Director Samuels of the BOP. The retaliation from the actual letter to Samuels caused Mann injuries under King v. Zamiara, 2015 BL 171102, 6th Cir., No. 13-1766, 6/1/15 which were EXACERBATED, FURTHERED, ACQUIESCED TO, or CONDONED BY SOE Schlottman and now SOE Bittenbender as well. Mann believes it is akin to absolute madness when the very First Amendment Right that was trod upon by Straub and his family members as if that right of Mann's was the grass beneath the Budweiser Kleidsdale Horses is the one that DIRECTLY CAUSED this brand new claim against SOE Schlottman and SOE Bittenbender.

22. Mann also states that he is able to demonstrate that through its deliberate conduct, the BOP was the "moving force" behind the injuries. The BOP is the place where a Corrections Culture has allowed the 'superior attitude' by Corrections Officers, and even promotes the attitude of indifference or intolerance of prisoners by the very same BOP employed, paid by the US Treasury, corrections officers. In order to do this, Mann must show that by acting in their personal and professional capacitties, the mandate in Monell v. New York City Dept. Of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) has been met. Mann identifies the policy,

whether written or unwritten that allows the corrections officers in all positions to act in a way that is protected by immunity so that the only recourse for prisoners is to exhaust all administrative remedies before the employee in question has to even hear about the issue. The PLRA (Prison Litigation Reform Act) which was put into effect under Bill Clinton (President) is the factor which allows the Corrections Officers to act any way they feel at that moment in time and space, which usually results in horrific deprivations of inmate rights.

23. This Corrections Culture has done nothing but allow this ongoing feeling of 'us v. them' and the continuing and ongoing projection of evil out upon the 'other.' The 'other' in this instance is, of course, the inmate, former criminal defendant turned prisoner/inmate.

The 'culture' is explained a bit more;

> Victims and defendants step into criminal proceedings with trepidation with good reason. Defendants are often treated as less than human and disposable. Victims are at times treated as invisible or a nuisance. Learning how to better respond to those in pain in criminal proceedings may be one of the most effective ways to address the seemingly unending cycles of violanece. After all, both prosecutors and defense attorneys care deeply about the safety and well-being of our families and communities.
>
> When trauma occurs, those impacted try to give meaning to the events and sometimes unconsciously adopt the familiar narrative of "good versus evil." Especially in a "hyper-alert climate," "a sense of 'us v. them' develops or deepens. ... Projecting evil out onto the other shifts attention away from the 'good' side's own shortcomings, their contribution to the conflict, and their own dysfunctions or internal societal ills. In essence, the 'other' becomes the sacrificial scapegoat." See Crim.L.Rep. (BNA), December 24, 2014, Opinion.
>
> ..."malignant leaders" can escalate anxiety and fear in the community by engaging in name-calling, dehumanizing by using us/them and good/evil narratives, magnifying danger and manipulating by withholding, distorting or misrepresenting facts. Id.

BOP employees have a taught or learned CULTURE that is used to create a 'good v. evil' dysfunction within the Corrections Officer. This attitude of indifference

or intolerance is taught to all of them, more likely than not, in the main campus where all Bureau of Prisons Corrections Officers are taught. The way to prove it is by allowing access to all training manuals, all curriculum and syllabi of each individual instructor, as well as those instructors notes to show that there is, in fact, a culture of indifference or intolerance toward inmates as a whole.

24. There is a clear and consistent pattern, and liability can be imposed that this is one of two clear and very similar issues that became extremely visible now that Mann was transferred due to the issues with Straub and his family who are all employed by the BOP. If not for the issues created by Straub and family, this issue would never have been able to have been committed, and Mann would never have been transferred, never would have been placed in a higher security facility (because of the actions of Straub, et al.), restricted with many more security criteria which disallow much of the law library access and prevent Mann from finalizing documents to the Courts.

25. Section 4202(a) of Title 18 directs the Bureau of Prisons to provide for the safekeeping and protection of the inmates in its care. See Friedman v. United States, 221 F. 3d 1334 [published in full-text format at 2000 U.S. App. LEXIS 15353], 2000 WL 876391, at *2 (6th Cir. 2000). To survive the United States' motion to dismiss, however, Parker must allege facts that, if true, would constitute a breach of duty. Parker speculates that BOP employees should have done many things differently, but even the most accommodating reading of the facts would not prove that the BOP failed to act reasonably under the circumstances.

> The BOP guards were not medical personnel and were thus wisely not expected to make any decisions that could affect Parker's medical treatment. Rather, once they realized that he needed immediate medical care, their responsibility was to get him to a trained medical professional - something which they did." Parker v. United States, 2012 U.S. Dist. LEXIS 88218, June 26, 2012, Opinion.

RECIPROCALLY, Mann is in the care of the BOP, and he has the expectataion that the BOP is to provide him the safekeeping and protection of inmates in their care. See Friedman v. United States, 221 F.3d 1334 [published in full-text format at 2000 U.S. App. LEXIS 15353], 2000 WL 876391, at *2 (6th Cir. 2000). Mann has, had, and will continue to have a reasonable expectation that the BOP will not violate the Constitutional Rights afforded him by the United States Constitution. As spelled out in King, Mann is having his First and Fifth Amendment Rights violated. Amazingly, the BOP Staff failed to protect thos inalienable rights of Mann's even though their training and continuing education and training cite multiple ways that the Corrections Officers within the BOP can avoid violating a prisoners rights.

26. Mann has compensatory damages, and wishes to be awarded punitive damages in this case as well, if this Court sees it a good way to assure that this does not happen again in the BOP. Financial 'slaps of the hand' seem to be one of the only things they totally understand.

27. The Fifth Amendment provides that "private property [shall not] be taken for public use without just compensation." U.S. Const. Amend. V., In order to state a claim under the Takings Clause, a plaintiff must first establish that he possesses a constitutionally protected property interest. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000-01, 81 L. Ed. 2d 815, 104 S. Ct. 2862 (1984).

When considering prison accounts of the sort at issue here, we have held that the interest income generated by the accounts constitutes a property interest "sufficiently fundamental that states may not appropriate it without implicating the Takings Clause." Schneider, 151 F. 3d at 1201. Nev. Rev. Stat. § 209.241(3)(1995) provides that "the interest and income earned on the money in the [prisoners' personal property] fund, after deducting any applicable charges, must be credited to the offenders' store fund." (emphasis added). It is therefore clear from the plain language of the statute that the state appropriates the interest generated by the personal property fund and spends it for the benefit of the prison population as a whole --- that is, for public use.

> As the Supreme court has recently noted, the dtermination that the state has taken the prisoners' interest "does not end our inquiry," but rather requires us to "determine whehter any 'just compensation' is due." Brown v. Legal Found. of Wash., 538 U.S. 216, 155 L. Ed. 2d 376, 123 S. Ct. 1406, 1419 ( 2003). In Brown, the Court revisited the issue it first considered in Phillips, anmely whehter the Fifth Amendment's Takings Clause bars the appropriation of the interest earned on client funds held in trust by attorneys. In Phillips, the Court concluded that the interest earned on such accounts "is the 'private property' of the owner of the principal," 524 U.S. at 17 2, but did not decide whether the state's transfer of that interest to charitable entities that provide legal services for the poor violated the Fifth Amendment. In Brown, the Court reached the latter issue and concluded that the transfer of interest from IOLTA accounts does not constitute a taking without just compensation. "Just compensation," the Court held, "is measured by the net value of the interest that was actually earned" by the owner of the principal. Brown, 123 S. Ct. at 1420 n. 10 (emphasis added). The Court reasoned that because the laws governing IOLTA required that any funds that could generate interest be maintained in an interest-bearing account, any funds actually deposited in a IOLTA account, by definition, could not generate interest. See id. Thus, "because...compensation is measured by [the] pecuniary loss" suffered by an individual, and because that loss "is zero whenever the [IOLTA] law is obeyed," the Court concluded that "there has been no violation of the Just Compensation Clause of the Fifth Amendment...." Id. at 1421.

As if to emphasize the unique nature of IOLTA laws, the Supreme Court made clear that, although those laws ensured that clients whose funds could generate interest would, in fact, receive that interest, "[a] law that requires that the interest on [an individual's] funds be transferred to a different owner for a legitimate public use...could be a per se taking requiring the payment of 'just compensation'...." Id.

As noted above, it is clear that by transferring the interest earned on the pooled resources of prisoner's property fund to the offenders' store fund to be expended "for the welfare and benefit of all offenders," Nev. Rev. Stat. § 209.221 does effect a transfer of the interest earned from the prisoners to the state. It is equally clear, though, that the costs the state incurs in administering the prisoners' property fund far out-strip the gross interest earned by the fund. Indeed, the record reflects that in the msot recent fiscal year for which we have data in the record, the NDOP expended #393,178 to provide the prisoners with personal property fund accounts, while the amount of interest transferred from the prisoners' personal property fund into the offenders' store fund was $108,485. In the aggregate, then, the prisoners' property fund generates no net gain at all, but rather a substantial loss.

What is not clear on the record before us, however is whether the interest earned by McIntyre's principal is exceeded by his share of the costs of administering the prisoners' personal property fund. This information, however, is precisely what we need to know in order to determine whether the director has taken McIntyre's interest without just compensation. For, as the Supreme Court noted in Brown, "it may be that the difference between what a pooled fund earns, and what the individual clients...lose, adds up to enough to [generate interest] while not depriving any of the clients...of just compensation." Brown, 123 S. Ct. at 1420 (quoting Wash. Legal Found. v. Legal Found. of Wash, 271 F. 3d 835, 883 (9th Cir. 2001)(Kozinski, J., dissenting). That is to say, it may well be that the costs of adminstering the prisoners' property fund are so high -- and the interest earned on McIntyre's account is so low -- that there is no net loss and therefore compensation owed. The district court, looking at the aggregate amounts spent on running the fund and at the aggregate amounts of interest generated, rightly concluded that there was a net loss in the prisoners' property fund as a whole. Whiel perhaps understandable, the district court's inference that, because the fund as a whole operated at a net loww, McIntyre himself could not have suffered a taking without compensation, cannot be squared with the per se analysis that, as the Supreme Court has made clear, remains applicable to cases (such as this one) involving the state's appropriation of interst income.

> Because it is clear that Ne.Rev. Stat. § 109.241 does effect a taking of inmate interest, and because, on this record we cannot determine whether there is any just compensation owed to McIntyre, the issue of compensation remains "a practical question...undeveloped on this record." Brown, 123 S. Ct. at 1420 (internal quotation marks omitted). We therefore vacate the district court's grant of summary judgment to Bayer on McIntyre's takings claim and remand for further proceedings not inconsistent with this opinion.
>
> III
>
> Because we conclude that, in light of Supreme Court's decision in Brown, further factual development is needed to determine whether McIntury suffered any net loss sufficient to entitle him to compensation, the district court's grant of summary judgment to the NDOP on McIntyre's takings claim is VACATED and REMANDED for further proceedings consistent with this opinion. See McIntyre v. Bayer, 339 F.3d 1097, November 7, 2002, Opinion (9th Cir. 2002).

It can be said, without hesitation that this case of Mann's is similar to Brown in that the Taking of Mann's property, which is **tangible**, is a manuscript of a story of fiction. When the staff of the B.O.P. states that this is "non educational" there is a oxymoron in play. If fiction writing is "non educational" then, we must all be very happy that SOE Schlottman and SOE Bittenbender (Supervisors of Education for FCI Milan and FCI Allenwood respectively) are not in charge of what makes it into schools in our country. If they were writers like Ernest Hemingway, F. John Fitzgerald, Ray Bradbury, and Mark Twain (just to name a few Fiction writers from the United States of America) would never even be read, studied, or welcomed into any curriculum as necessary reading to understand how a "creative writer" researches, develops, and implements a story. Whether a 3 act book ro not; irrespective of the forumla used by a writer to create, the fact remains that the story is what is important. Understanding the underlying tone, reading between the lines so to speak, and any metaphors that come from the book or manuscript is also important for our educational system.

28. The Supreme Court has held that where adequate remedies are provided by state law, the negligent or intentional loss or destruction of personal property does not state a claim cognizable under the Fourteenth Amendment's Due Process Clause. Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); Parratt v. Taylore, 451 U.S. 527, 537, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). In order to assert a claim for deprivation of property without due process pursuant to 42 U.S.C. § 1983, a plaintiff must allege that the state post-deprivation procedures are inadequate to remedy the deprivation. Parratt v. Taylor, 451 U.S. at 543-44. Similarly, the Sixth Circuit has stated, "in section 1983 damage suits claiming the deprivation of a property interest without procedural due process of law, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate." Vicory v. Walton, 721 F. 2d 1062, 1066 (6th Cir. 1983). The Sixth Circuit has found that Kentucky's statutory remedy for such losses is adequate within the meaning of Parratt. Wagner v. Higgins, 754 F. 2d 186, 191-92 (6th Cir. 1985). The same rationale applies to claims under the Fifth Amendment Takings Clause; that is, no taking has occurred absent a showing that available remedies have been pursued and have failed to provide adequate compensation. Hudson v. Palmer, 468 U.S. at 539 (O'Connor, J., concurring).

As explained by Justice O'Connor,

> [A] mere allegation of property deprivation does not by itself state a constitutional claim under either [the Due Process Takings] Clause. The Constitution requires the Government, if it deprives people of their property, to provide due process of law and to make just compensation for any takings. The due process requirement meets that Government must provide to the inmate the remedies it promised would be available. Concomitantly, the just compensation requirement means that the remedies made available must adequately compensate for any takings that have occurred. Thus, in challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate. When adequate remedies are provided and followed, no uncompensated taking or deprivation of property without due process can result. Id. (Citations Omitted). Plaintiff has failed to demonstrate an inadequacy of state remedies in the case at bar.

The second reason the individual-capacity claim against

Defendant Braz fails because Plaintiff fails to connect him to any of the alleged wrongdoing. While the Court is aware of its duty to construe pro se complaints liberally, Plaintiff is not absolved of his duty to comply with the Federal Rules of Civil Procedure by providing Defendants with "fair notice of the basis for [his] claims." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). To state a claim for relief, P¼laintiff must show how each Defendant is accountable because the Defendant was personally invovled in the acts about which Plaintiff complains. Rizzo v. Goode, 423 U.S. 362, 375-77, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976); see Colvin v. Caruso, 605 F. 3d 282, 292 (6th Cir. 2010(stating "officials are personally liable for damages under [§ 1983] 'only for their own unconstitutional behavior'")(quoting Leach v. Shelby Cnty. Sheriff, 891 F.2d 1241, 1246 (6th Cir. 1989)).

Mann is certain that he has complied with any and all requisite Administrative Remedies, irrespective and regardless of what the Defendants claim. Mann has filed with the N.C. Regional Office, and exhausted the same Prison Litigation Reform Act remedies within the steps required by inmates held by the Federal Bureau of Prisons. Mann has also complied with and completed any and all remedies required by the Federal Tort Claims Act (FTCA) by completing the necessary DOJ Form 95 form, submitting same to the North Central Regional Office in Kansas City, KS. There can be absolutely no dispute that the claims against a BOP Corrections Officer will be (always and forever, willed without end, Amen) provided immunity of some sort. That is why Mann, in his own knowledge of the Federal Bureaucracy and Empirical ways within same filed both the PLRA and FTCA remedies. Knowing how the Millbrook 133 S. Ct. 1441, 185 L. Ed. 2d 531 (Mar. 27, 2013) case affects all prisoners rights, Mann knows that the Supreme Court held, "the [Federal Tort Claims Act (FTCA)] waiver effected by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers

are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest." Millbrook, 133 S. Ct. at 1446.

29. BOP correctional officers fall within the definition of federal investigative or law enforcement officers under § 2680(h). See Millbrook v. United States, 133 S. Ct. 1441, 1446, 185 L. Ed. 2d 531 (2013); see also Morrow v. Fed. Bureau of Prisons, 255 F. App'x 378, 380 (11th Cir. 2007)(finding that plaintiff's claims for false imprisonment against BOP officials were included in the FTCA's waiver of sovereign immunity; Chapa v. DOJ, 339 F. 3d 388, 390 (5th Cir. 2003)("Thus, as defined in § 2680(h), a BOP official is a federal law endforcement officer."); James v. Mason, No. 1:10-CV-01706, 2013 U.S. Dist. LEXIS 146356, 2013 WL 5592417, at *4 (W.D. La. Oct. 9, 2013)("BOP employees clearly fit within the definition of Section 2680(h) as 'law enforcement officers...of the United States who are empowered by law...to make arrests for violations of Federal law.'"). Quoting White v. Stephens, 2014 U.S. Dist. LEXIS 138876:: August 28, 2014, Opinion.

30. The FTCA bars claimants from brinign suit in federal court until they have exhausted their administrative remedies. 28 U.S.C. § 2675; McNeil v. United States, 508 U.S. 106, 113, 113 S. Ct. 1980, 124 L. Ed. 2d 21 (1993); Myers v. United States, 526 F. 3d 303, 305 (6th Cir. 2008). "An FTCA tort claimant must present his claim in writing to the appropriate agency within two years of the date of the claim accrued, and bring a civil action within six months after the agency mails the notice of final denial of the claim." Brockett v. Parks, 48 2401(b); Blakely v. United States,

276 F.3d 853, 865 (6th Cior. 1996); Graham v. United States, 96 F. 3d 446, 448 (9th Cir. 1996)). "In order to fulfill this requirement, the claimant must: (1) give written notice of the claim sufficient to enable the agency to investigate the claim; and (2) place a value (of 'sum'certain') on the claim." Garzon v. Luttrell8, 24 F. App'x 400, 402 (6th Cir. 2001)(citing Glarner v. United States, 30 F. 3d 697, 700 (6th Cir. 1994); 28 C.F.R. § 14.2(a)). If the agency denies the claim or fails to dispose of it within six months, the claimant may file a civil action in federal court. Hold v. Morgan, 79 F. App'x 139, 141 (6th Cir. 2003). "Failure to exhaust administrative remedies deprives a federal court of jurisdiction over the claim." Id. (citing Glarner, 30 F.3d at 700); Estate of Estrada v. United States Dep't of Veterans Affairs, No. 1:12-cv-02215, 2014 U.S. Dist. LEXIS 25544, 2014 WL 794143, at *3 (N.D. Ohio Feb. 26, 2014); see also Kenney v. United States, No. 12-138-KKC, 2013 U.S. Dist. LEXIS 98254, 2013 WL 3733611, at *1 (E.D. Ky. July 15, 2013)(citing Roberts v. United States, 191 F. App'x 338, 344 (6th Cir. 2006))("The appropriate remedy for failure to exhaust is dismissal for lack of subject matter jurisdiction."). "Thus, failing to comply with that prerequisite is grounds for dismissing a claim under the FTCA." Goosby v. United States, 545 F. Supp. 2d 725, 733-34 (W.D. Tenn. 2008)(citing Miller v. United States, No. 99-3998, 2000 U.S. App. LEXIS 19512, 2000 WL 1140726, at *2 (6th Cir. Aug. 7, 2000); Joelson v. United States, 86 F.3d 1413, 1422 (6th Cir. 1996); Carpenter v. Laxton, No. 95-6076, 1996 U.S. App. LEXIS 25325, 1996 WL 499099, at *4 (6th Cir. Sept. 3, 1996) Pritchett v. Johnson, 402 F. Supp. 2d 808, 818-19 (E.D. Mich. 2005)).

31. In Mann's case there is a reference to Mann bringing and completing all of the required remedies. In Mann's case, there is a monetary amount placed upon the stolen property. In Mann's case he names Supervisor of Education of FCI Milan Schlottman and Supervisor of Education Bittenbender, as well as many other named Defendants as being the culprits in this theivery. In Mann's case he has exhausted all of his rememdies. In Mann's case, irrespective and regardless of what the BOP says, does, or forces their employees to swear to or certify -- Mann has a Takings Clause Claim against these individuals. When these individuals (which may or may not occur) are found to have immunity the FTCA would be allowable with an AMENDED complaint, and only then. First, the PLRA 1983 suit would need to complete. There can be no doubt or argument that this has been done and Mann is awaiting this Court to simply find in favor of Mann to avoid a costly legal process to allow the BOP to fight or the individuals to fight something they know is incorrect.

32. As to the next issue, the tort claim for Abuse of Process, the elements are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of the process. Abuse of Process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order. By knowing that this case could go to court, the Defendants are abusing the process by intentionally absconding with Mann's Manuscript, which was taken through illegal and unconstitutional means. The elements of Abuse of Process are

met.

33. Government officials confiscated Mann's property for public use without providing just compensation. The property was confiscated without a due process prior to the confiscation. The Takings Clause of the Fifth Amendment should be the avenue for relief. If this Honorable Court believes that the Fourteenth Amendment Due Process Clause is to suit this claim better, that is for them to decide. The elements of the Takings Clause are met as well as the Fourteenth Amendment Due Process violations. Either way there is a harsh stripping of rights.

34. Government corrections officers interfered with prospective economic advantage by satisfying the elements, which are; (1) the existence of a valid business relationship or expenctancy; (2) knowledge of the relationship or expectancy by the defendant; (3) intentional interference by the defendant which induces or causes a breach or termination of the relationship or expectancey; and (4) damage to the plaintiff. BPS Clinical Lab. v. Blue Cross & Blue Shield of Mich., 217 Mich. App. 687, 698, 552 N.W. 2d 919, 925 (1996)(per curiam). Schlottman knew Mann had been working on his own fiction to place into a larger piece of fiction for publication. Schlottman knew of Mann's past in insurance, writing, and hope for future publication. In fact, on a Saturday, Schlottman decided to sit Mann down and discuss his experiences in life, strength that he gained from these experiences, and hope for future events as well as satisfaction with how his life has been evolving. Schlottman shared with Mann about his Mother, who, while he was living in Chicago, Illinois near the Cabrini Green projects, neglected Schlottman and his brother. Eventually Schlottman

and his brother (whether or not it was Schlottman's half brother or actual brother Mann is not totally sure, but Mann does believe that the brother was a ½ brother) were put in Foster Care within the City of Chicago's Department of Children and Family Services. The ½ brother was salvaged by his biological father, and Schlottman was left in the Foster Care system. Eventually Schlottman made his way into the Boys Town (or similar) group homes. Schlottman was given direction, and a way to move forward in life through the costs of education being covered by the Boys Town group. The Director, according to Schlottman urged him to go to High School, gain a diploma, go to college and get an Associates, and on to a regular college to obtain a Bachelors degree. Whether or not Schlottman gained a Masters is unclear to Mann. Schlottman did make a trip to South Africa to meet his future Wife's family. Schlottman was married in South Africa, and while he was there his brother (½ brother) passed away. Somehow, Schlottman gained word of his ½ brothers death, and left South Africa (with or without his wife is unclear to Mann) to see his brother before he died.

Schlottman shared all of this adversity to show Mann that he was himself a few bad decisions away from prison. It was after this that Mann shared his belief that some of his writing would be published because while he had been in college (Columbia, ITT Hartford BIS, ITT Hartford Cluster Training, CU School For Agents) his true passion was fiction writing. Mann shared the work (in a verbal way, not in print or off of the computer) he wished to publish with Schlottman. Schlottman was aware of Mann's intent of a business transaction with his manuscripts, and was absolutely able to understand Mann's

ideology for a book, treatment, script, and ultimately a excellent future income. This was all taken away from Mann when Schlottman knowingly witheld Mann's manuscript from Mann by not releasing it to Mann, making comments to Mann that it was some "wild stuff," and the other comments that were totally unbelievable that the writing was/is "non educational," and therefore would not be given to Mann.

35. The censorship by SOE Schlottman is condoned and acquiesced to by SOE Bittenbender when she takes his e mail as truth, and tells Mann that this manuscript, even if it did exist (which she states in a post it not that it does not exist), was "non-educational." Mann feels an obligation to re-state that it is absolutely a miracle that people like Schlottman and Bittenbender are not above their ranks within the BOP and out committing a book-burning just like was performed in Nazi Germany. Mann retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the correctional system. See Pell, 417 U.S. at 822. It is well established that rehabilitation is a legitimate penological objective of the penal system. Id. at 823. Allowing an inmate to express opinions using symbols associated with gangs and racial hatred is incompatible with a prison's interest in eliminating all traces of gang influence and rehabilitating its inmates. See Koutnik v. Brown, 2005 U.S. Dist. LEXIS 12643:: June 22, 2005, Opinion.

36. Mann was not, did not, and does not write about gangs, symbols or other items which are not commensurate to Mann's correctional needs, nor would Mann's writing (fiction) create a need to be censored from Mann or any other inmate in the BOP. The strange and wonderful

story of Mann's experience with a character that is purple, furry, and named Grimace is hardly something that can be considered a depiction of a manuscript that is to be necessary of censorship whether in prison or out of prison. This is a sequence of events that occur to Mann while he is in the company of Grimace, that have nothing to do with gangs, symbolism, or any organized criminal activities. In fact, the fiction writing in this manuscript is so good, so strange, and such a wonderful depiction of the quest for what one wants out of life, that there is a true expectation that this manuscript will bring about enormous income for Mann -- Schlottman had knowledge of all of this when he and Mann spoke on that Saturday or Sunday afternoon in the Education Office of Schlottman's at FCI Milan. There can be no testimony or statements by Schlottman that he did not know Mann intended to make an income off of his writing when he left prison. As this Honorable Court can hopefully tell by now, Mann is an able writer, who can allow the audience to become engaged by the writing. Whether or not this Honorable Court would purchase a book by Mann is irrelevant, that someone would is what counts. The Target Market for Mann will transcend races, generations, as well as age groups or age bands. Mann is certain that his writing will not just make an income, it will make him incredibly wealthy.

37. By stating that Mann did not have these plans, did not write this manuscript in a password protected environment held on a BOP server, and did not witness multiple other inmates with their own writing printed off of the server by C.O. Rische would be fales. Mann saw these acts, errors, omissions, intentional torts, and severe actions of prejudice toward a prisoner, who is a U.S. Citizen.

Whether or not the SOE's being sued in this case wish to believe it, Mann's First Amendment Rights have been violated, his Fifth Amendment Taking Clause has been violated, and his Fourteenth Amendment Right to Due Process has been violated as well. Abuse of Process, and other claims the Court feels have been committed are welcome in this suit as well. Mann can only think of those he listed herein, and hopes that this Honorable Court sees what Mann sees. The only way for this type of superiority and gestapo-like tactics can be curbed by federal officers who are actually federal corrections officers -- is through their checkbook. The only way to send the proper message to the BOP is through a HUGE reward to Mann. Mann's manuscript is easily going to be a $1,000,000 item. The loss of use is a $10,000,000 issue.

**WHEREFORE**, Mann prays that this Honorable Court will GRANT Mann the following relief:

A. GRANT Mann his $1,000,000 for compensatory damages, now allowable under King v. Zamiara, 2015 BL 171102, 6th Cir., No. 13-1766, 6/1/15;

B. GRANT Mann the resultant $10,000,000 in damages due to the loss of use, or in the alternative $10,000,000 in damages for his mental, emotional injury suffered as a result of the First Amendment Violation to Mann by Defendants;

C. GRANT Mann $1,000,000 for compensatory damages, now allowable under ruling in King v. Zamiara, 2015 BL 171102, 6th Cir., No. 13-1766, 6/1/15;

D. GRANT Mann $1,000,000 for compensatory damages, now allowable under King v. Zamiara, 2015 BL 171102, 6th Cir., No. 13-1766, 6/1/15;

E. GRANT Mann any other punitive damages this Honorable Court believes

are just and proper in the neighborhood of an additional $10,000,000 to let the Bureau of Prisons know that these types of actions are severely dealt with when violations of Constitutional Rights occur as mere happenstance every day, with no regard for a prisoners individual inalienable Constitutional Rights;

F. GRANT Mann an additional $1,000,000 under the Religious Land Use and Institutionalized Persons Act (RLUIPA) for compensatory damages, as well as an additional $10,000,000 in punitive damages, as well as declatory relief under the same Act;

G. GRANT Mann any such other and further relief as this Court deems just and proper.

Date: 7 / 28 / 15

Jack Mann, 22865-424
FCI ALLENWOOD, PO BOX 2000
WHITE DEER, PA 17887

CERTIFICATE OF SERVICE

I, Jack Mann, hereby swear under penalty of perjury that on the date below this Civil Complaint was submitted to the Courts with a copy for the Clerk of Courts Prisoner Correspondent to submit to the Court as well as one to the Defendants through service by the USMS. This is in compliance with the Mailbox Rule, as on this date the Complaint was given to a Bureau of Prisons Corrections Officer.

Date: 7 / 28 / 15

Jack Mann, pro-se

CLERK OF COURTS
231 S. Lafayette
Detroit, MI 48226

Re: NEW CASE

Dear Prisoner Correspondent:

Please find the enclosed Civil Complaint.

I would like you to submit the single copy of the entire motion back to me stamped RECEIVED so that I have a copy for my file.

Also, please let me know when you believe that we could get the data necessary for me to submit a discovery request to the defendants. This is imperative, and there is also a need for a court order, more likely than not to get the requisite discovery.

Please also note that any forms necessary for the USMS to serve these Defendants needs to be sumbitted to me, the notice of a civil suit, and waivers of service to avoid the costs of USMS on the government as I am pro-se.

Let me know if that is a viable option.

Regards,

7/28/15

Jack Mann, 22865-424
FCI ALLENWOOD MEDIUM
PO BOX 2000
WHITE DEER, PA 17887

Jack Mann 22865-424
FCI Allenwood
PO Box 2000
White Deer PA 17887



RECEIVED
AUG 07 2015
CLERK'S OFFICE
DETROIT

RES

⇝22865-424⇔
U S District Court
Clerk Of Courts
231 W Lafayette BLVD
Room 564
Detroit, MI 48226
United States

# CIVIL COVER SHEET FOR PRISONER CASES

| | |
|---|---|
| **Case No.** 15-12869 **Judge:** Matthew F. Leitman **Magistrate Judge:** R. Steven Whalen | |
| **Name of 1st Listed Plaintiff/Petitioner:** Jack Mann | **Name of 1st Listed Defendant/Respondent:** Schlottman, et al. |
| **Inmate Number:** 22865-424 | **Additional Information:** |
| **Plaintiff/Petitioner's Attorney and Address Information:** FCI Allenwood Medium<br>PO Box 2000<br>White Deer, PA 17887 | |
| **Correctional Facility:** | |

**BASIS OF JURISDICTION**
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question

**NATURE OF SUIT**
- ☐ 530 Habeas Corpus
- ☐ 540 Mandamus
- ☒ 550 Civil Rights
- ☐ 555 Prison Conditions

**ORIGIN**
- ☒ 1 Original Proceeding
- ☐ 5 Transferred from Another District Court
- ☐ Other:

**FEE STATUS**
- ☒ IFP *In Forma Pauperis*
- ☐ PD Paid

---

**PURSUANT TO LOCAL RULE 83.11**

1. **Is this a case that has been previously dismissed?**
   ☐ Yes ☐ No
   ➢ **If yes, give the following information:**
   **Court:** ______
   **Case No:** ______
   **Judge:** ______

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   ☐ Yes ☐ No
   ➢ **If yes, give the following information:**
   **Court:** ______
   **Case No:** ______
   **Judge:** ______